## Fleming *against* Kerr.

A testator being seised of a tract of land, in shape an oblong parallelo-
gram, situate upon a river, thus disposed of the same:—"I will unto my living
wife Margaret the one-third of the plantation I now live on, beginning at the
river and to run back, also the house I live in; and after her death, I will that
my daughter Susannah shall have the above named one-third of the place I now
live on, for her, her heirs and assigns for ever. I will one-third of the place I
now live on to my son Joseph with the stone coal quarry on it, to him, his heirs
and assigns forever. I will unto my son George all the remaining part of my
real and personal estate, after payment of debts," &c.  *Held*, that the devisees
did not take the estate as tenants in common, but that each took the separate third
of the whole in quantity, as it was designated by the will.

If the owners of separate parts of a tract of land, make a division among them-
selves, by which they intend each part to be made equal in quantity, and acqui-
esce in the same for a number of years, such division will not afterwards be
avoided because of a small mistake in the quantity allotted to one of them.

ERROR to the district court of *Allegheny* county.

Susannah Fleming, a lunatic, by her committee, Francis C. Fla-
nagan and Garrett Wall against James Kerr. This was origi-
nally an action of partition, but, by consent, was changed into an
action of ejectment.

Both parties claim under Peter Fleming, who, it is admitted,
died seised of a tract of land in Elizabeth township, containing
223 acres and allowance. The testator, Peter Fleming, by his
will, dated December 8, 1792, made the following disposition of his
estate:—

"In the name of God, amen—I, Peter Fleming, of Elizabeth
township, Allegheny county, and state of Pennsylvania, being
weak in body, but of sound disposing mind and memory, do make
this instrument of writing as my last will and testament, in manner
following:—

"1. I bequeath my soul to God who gave it, and my body to
the dust, in hopes of a joyful resurrection at the last day.

"2. I will unto my living wife Margaret, the one-third of the
plantation I now live on, beginning at the river and to run back,
also the house I live in, one bed and bedding, two cows, and all
the kitchen furniture during her natural life, and after her death, I
will that my daughter Susannah shall have the above named one-
third of the place I now live on, for her, her heirs and assigns for-
ever, as also all the other above named articles. I will that my
daughter Susannah shall have the young roan mare, chest of draw-
ers, spice box, dressing box, and bed and bedding. I will one-
third of the place I now live on to my son Joseph, with the stone

*[Fleming v. Kerr.]*

coal quarry on it, to him, his heirs and assigns forever.  I will unto my daughter, Margaret Reynolds, fifteen pounds.  I will unto my son George, all the remaining part of my real and personal estate, after payment of debts, necessary expenses, legacies, whom I constitute and appoint my whole and sole executor of this my last will and testament."

The testator died in 1807.

The land lies on the Monongahela river, with the exception of a small offset in the east end, and is in shape an oblong parallelogram, with one of its long sides on the river bank.  The mansion house spoken of in the will is about in the middle of the tract.  The stone coal quarry given to Joseph is on the eastern end of the tract.

After the death of the testator in 1807, the brothers continued to live with their mother and sister in the house—and all the witnesses agree that, though they lived in the house with their sister, Joseph had the eastern end on which his stone coal quarry was, to himself—selling coal and timber, and receiving the rents of it—that the sister exercised exclusive ownership over the middle part—and George over the remaining or western end.  Although no precise boundary then was run between the several portions, yet each exercised acts of exclusive ownership over their own portion—Susannah claiming no rights over the eastern or western ends—Joseph claiming no rights over the middle or western parts—and George claiming no rights over the eastern or middle—but only over the western end.

They continued in this way till November 1824, when George becoming indebted, was obliged to sell, and accordingly agreed to convey his part to James Kerr, the defendant; and in order to fix his boundary, a surveyor (Mr Joseph Vankirk) was brought to the premises with a full knowledge of all the parties concerned, and run a line east from the river perpendicular to it, cutting the western end of the tract, the one-third in quantity of the whole tract.  He did not run round the whole tract to ascertain the quantity, but assuming the quantity on the return of survey, to be correct, viz., 222 acres and 151 perches, he ran a line which set off to George a few perches more than a third part.

According to this survey a deed was made to James Kerr, who took possession, and soon after built his fence on this line, and has so held ever since till the summer of 1838, when Susannah and Joseph having been found lunatics by inquisition, their committee instituted this suit, which was originally an action of partition.

When the case came before this court at a former term, on the plea of *non tenent in simul,* the court, believing that the plaintiffs could not, from their own showing, sustain the action, advised the parties to convert it into an action of ejectment—and as Joseph was dead, it was agreed the case should proceed as an ejectment between Susannah alone, and James Kerr, the defendant.

x.—2 N*

The plaintiff assumed the ground, that the will of Peter Fleming created a tenancy in common among the devisees, and that the division of 1824 was made under a mistake of their rights; that a division into equal quantities was of unequal value in its parts, and therefore she was entitled to recover an undivided third of the whole, that she might have an equal partition.

Joel Ketchum, sworn, said, I know the land; I have been called upon to survey it. I laid down the lines according to a division, both according to quantity and quality; making it the basis of my division, that the third part in quantity set off to Kerr was worth both the others, according to the opinion of the witnesses which corresponds with my own opinion. Kerr's is worth one-third more than Susannah's; and hers worth one-third more than Joseph's. Between 30 and 40 acres of bottom land in Kerr's part; about 10 on Suky's; not any on Joseph's but what would overflow. To divide according to quantity and quality, as claimed by plaintiff, Kerr should have 53 acres 64 perches; Susan 80 acres 16 perches; Joseph 106 acres 128 perches. It would leave Kerr's river line 51 perches and nine-tenths from the hoop-ash, and the same on the back line; of valuable timber, that on Kerr's third was worth more than on both the other shares. Joseph and Susannah have nearly all the broken land; 80 acres and 16 perches would be the one-third of the land; Kerr has 81 acres and 150 perches. The hoop-ash is a patent corner; it is five rods from this hoop-ash to where they measured under the bank. Measuring on top of the bank Kerr has 79 acres and 31 perches. My draft setting forth lines as to quality and quantity, are made from Vankirk's notes. Am the administrator of Joseph Fleming. I estimated it as of the value in 1824, when Vankirk run the line in 1824. Kerr's part has been worth both the others, both then and since. There was no house on his part; lived on the place adjoining. In valuing these parts I took in view the coal. The same stratum of coal runs through both tracts. The tracts below are 100 feet higher than those. While the children all lived they lived together. They lived together in the old mansion house; always allowing the lower end to belong to Joseph, the middle to Susannah, and the upper to George. March 23, 1838, inquisition of lunacy, finding Joseph a lunatic for five years. Same day, Susannah found a lunatic for two years. They lived together, each claiming their own and a portion, but had no line run between them till, in 1824, George sold his share to defendant, when a line was run for the purchaser. Running on top the bank, plaintiffs have each 78 acres and 130 perches, and Kerr 80 acres and 19 perches.

James Wilson, sworn.—Knew Susannah. The family all lived together, while I lived amongst them. Had all alike; George had the greatest control. David Edwards, husband of Susannah, often wanted it divided; George refused. They were all fond of drink. Susannah and Joseph capable of managing business except when

[Fleming v. Lerr.]

they drank too much.   They were capable enough of any kind of business.   Not so very easily imposed on.

Cross-examined.—Twice that I was up there, eight or nine years ago, Joseph not fit to do any thing.   About six years ago Susannah was pretty near blind.

The defendant then gave in evidence the following release of the plaintiffs.

" Know all men by these presents, that whereas Peter Fleming, of Elizabeth township, Allegheny county, Pennsylvania, by will, dated December 8, 1792, and recorded in book No. 1, page 252, did devise and bequeath unto his three children, viz: to Susannah, George and Joseph Fleming, to each of them, the one-third part of the farm he then lived on, situate on the Monongahela river, and also constitute George Fleming the sole executor of his will, &c. And whereas, a divide was amicably made with George Fleming, in April 1824, as follows, viz: Beginning at a hoop-ash on the margin of the river; thence by lands of George Gilmer's heirs, south 3° east, 163.5 perches to a post; thence north 87° east, 77.3 perches to a post; thence north 3° west, 163.5 perches to said river; thence up the same to place of beginning, containing 74 acres 83 perches and allowance as his divide of said land; which he, the said George Fleming, afterwards sold to James Kerr.   Now this is to certify, that we, the said Susannah and Joseph Fleming, were present, were fully and perfectly satisfied with said divide, and that we always were and are at present perfectly satisfied with said divide, notwithstanding the assertions of any person or persons to the contrary.

" Given under our hands and seals, this 21st day of September 1835.

his<br>
" JOSEPH  ✕  FLEMING,  [L. S.]<br>
mark

her<br>
" SUSANNAH  ✕  FLEMING, [L. S.]<br>
mark

" Witnesses present, J. Craighead, J. H. Watson."

Joseph Vankirk, who made the division in 1824, testified as follows:—In the year 1824, I was called upon by James Kerr to meet at the house of Joseph, Susannah and George Fleming, when they lived, in Elizabeth township, to run off a piece of land which George Fleming had sold to James Kerr, viz. one-third of the whole tract they were living on, being the land which belonged to old Peter Fleming, deceased.   Joseph and Susannah, and I believe George, as well as James Kerr were present on the day I attended and made the survey required.   A part of said tract was run off for James Kerr, with the full approbation of all the parties, and the draft now before me is the plat of the survey I made at the time, and the original plat I then made; and the part on this plat marked

[Fleming v. Kerr.]

James Kerr, 74 acres 3S perches, is the part that was surveyed and laid off to James Kerr. The deed now before me, in my hand writing, is the deed from George Fleming for the same part to James Kerr, dated November 1, 1824.. I did not survey the whole tract so as to ascertain the exact quantity, but from papers produced, I saw this portion run off as one-third of the whole, as near as I could. The homestead or dwelling house was not on the part laid off to Kerr, nor to the best of my belief within forty perches of Kerr's line. In my opinion the homestead was in the middle part of the whole tract. I know of no stone coal pit on the part laid off to Kerr—none to my knowledge. I understood that the part of George which he sold and was laid off to Kerr, was with the knowledge and full consent of all the parties at the time of the survey. If any objections existed they were unknown to me. I knew Joseph at that time; never observed any want of *intellect*, nor never thought of such a thing. I was well acquainted with Joseph at that time, and for many years before, and never thought of him being in any way incapable of attending to his own interest.

James H. Watson testified as follows:—

I am acquainted with Joseph and Susannah Fleming, and have known them for twenty-five or twenty-six years past, have lived for that time within about a mile and a half of them. I was at the house of Joseph and Susannah Fleming on one occasion, and the paper I now hold in my hand was handed by David Kerr to John Craighead, Esq., who was also there, and Mr Craighead read the paper over to Joseph and Susannah, and explained to them, that it was a release for them to James Kerr for the division of the property as it had been sold by George Fleming to James Kerr, and surveyed by Joseph Vankirk. Joseph and Susannah both observed that they were satisfied that it was George's tract, and they always had been satisfied. They then both executed this paper by making their marks, as neither of them could write. Mr Craighead and I then subscribed our names as witnesses to the execution, and Esquire Craighead at same time took their acknowledgment and subscribed same officially. James Kerr was not at this time present. I thought that Joseph and Susannah Fleming were at that time as capable of doing their business, knowingly, as at any time I had ever known them, and I saw no want of mind in Joseph at the time, but that it was as good as it ever had been. They both perfectly understood what the paper was, and what it contained. Esquire Craighead read it all over to them, and they said they were fully agreed to it. The stone coal quarry mentioned in the will of old Peter Fleming, is on the lower third of the tract as platted, and on side adjoining Irwin and Applegate. And the dwelling of old Peter Fleming, mentioned in his will, is on the middle third, by the lines running from the river bank. I am satisfied no other division could be made agreeably to said will, than the one exhibited by the plat, giving George the part joining Gilmore, and which he sold to

[Fleming v. Kerr.]

James Kerr.   I know of no other division which would have given Joseph the stone coal quarry and Susannah the house, and from conversation with all the parties, I understood from them, after the death of their father, that such division was what they considered the part of each, and dealing with them for timber, which I frequently had to buy from them, I dealt with each respectively, according to where such timber grew on the land of each.   My recollection now is, that James Kerr got possession of the part that was laid off for him about the time it was surveyed, and he has had possession of it ever since, exclusive of Joseph and Susannah, and they have each had possession of the parts allotted them ever since, and claimed the same as their bounds.   I never heard any objections by Joseph or Susannah against Mr Kerr's owning and occupying said grounds.   About eighteen months ago, or thereabouts, when I had heard of some intention of disturbing the division of the property, I had a conversation with Susannah on that subject, and she manifested displeasure that any such attempt should be made; that she had always been satisfied; and Joseph also told me he was satisfied, and both thought that other people should not interfere.

The defendant called several other witnesses, who testified that Joseph and Susannah Fleming were of perfectly sound mind when the foregoing release was executed.

The court below thus charged the jury:

*Grier*, president.—"It is not pretended that the defendant has gone over the line made in 1824, when he purchased; and if the principle on which this line was run (of giving an equal number of acres to each) be correct, there has been no such error committed in the original location of it; as to call for an alteration some fifteen years after it has been held to, and acquiesced in, by both parties.

" When the line was run in 1824, the parties and surveyors were at the plaintiff's house.   Although she did not go out to see the line run, she could see from her house where it was run.   She has lived in sight ever since, and has seen defendant build his fence up to this line without forbidding him.   She no doubt confided in her brothers, and the surveyors, that they would not do her wrong: and would have been little wiser, by walking round the land with the surveyor.   She has, eleven years after this survey (in 1835), while yet (if you believe the-witnesses) in full exercise of her faculties, confirmed by her deed the line then run:—and now,-upwards of thirty years after the death of her father, and fifteen after the running of this boundary line, the committee of plaintiff have brought this action to disturb this boundary line, on the ground that the plaintiff was imposed upon, and has not received her fair proportion of her father's estate.

" It appears by the survey made by the artist appointed by the court, that as this division line was originally run, the part allotted to George and sold to defendant, has a little over an acre more, (one

[Fleming v. Kerr.]

acre and fifty-seven perches, calculating from the corners, and not to the water edge,) than he was entitled to, if the principle of an equal division as to quantity be correct.

" It is palpable that it was not to correct this error that this suit was brought; for until the artist appointed by the court after an accurate measurement, made since the commencement of this suit, discovered this trifling error, it does not appear that the parties even knew of it. It seldom happens that different surveys, even where made by the same surveyor, over broken and hilly land, exactly agree. I have known in a contention (where every acre counted its hundred dollars) about quantity in a survey, that three different surveys made on improved and level land, were sworn to as correct by three experienced surveyors, and the difference was much greater than in the present case. Suffice it to say, that unless some greater mistake has been made than this acre of measurement, or some greater fraud committed on the rights of the plaintiff, the court and jury ought not, under the circumstances of the case, to disturb the line, as it has been established.

" This then brings us to the main and important question, urged and relied upon by plaintiff's counsel in this case, and which, I presume, forms the real ground for the present contest. It is contended by the plaintiff's counsel, that this line has been run under an entire mistake of the rights of the plaintiff. That Susannah and Joseph and George, were tenants-in-common of the whole tract by their father's will: that the land should therefore have been divided between them, not according to quantity only, but according to quantity and quality:—that the will of Peter Fleming shows an intention to make them equal—whereas (as they contend) George's portion is worth one-half more than Susannah's, and thus if she and Joseph should divide by a line running from the river, so as to have equal quantities, that Susannah's would be one-half better than Joseph's:—that to make them equal, George should only have had 53 acres, Susannah 80, and Joseph 106.

" If this be the case, if Susannah has been imposed upon by her brother and the defendant, if this line was fraudulently run, or if the parties all acted under a mistake of their rights, and the plaintiff has been so materially injured, as her counsel contends, it would present a case proper for the interference of the court in her behalf, notwithstanding her apparent acquiescence, and the signing of the release. But does the will of Peter Fleming make his children tenants-in-common in this whole tract, or show any clear intention that it should be divided equally, both as to quantity and quality? This is a question for the court to decide and not the jury.

" There is undoubtedly considerable obscurity in the words used in this will, as to how this land was to be divided between his children; but which is in a great measure removed, by looking at the position and shape of the whole tract, as also the position of the mansion house, and the stone coal quarry.

*[Fleming v. Kerr.]*

"In searching for the intention of the testator, which is the polar star to guide us, we must suppose ourselves in his situation at the time the will was made. He first gives to his wife, with remainder to his daughter, a third part; evidently not an undivided third, for he attempts to describe and locate it, though with a want of precise expressions: her third is to 'begin at the river, and run back,' but how or where? Why it must include 'the house I live in.' Susannah is to have, not an equal or undivided third of the whole after her mother's death, but the 'above mentioned one-third.' He seems to think he has sufficiently described its position. This land lay with a front on the river, of upwards of 200 perches. The back line was parallel to the river. The upper line perpendicular to it; the lower line somewhat irregular. He was in his mansion house about the middle of this tract. He evidently intends the middle portion of his farm, which would include the house for his wife and daughter; and if he had been asked to explain what he meant by 'beginning at the river and running back,' would have said, 'by beginning at the river, and running two lines back perpendicular to the river: not by beginning at one of the end lines, and running her a third with the whole front on the river, and putting the boys back on the hills. But this is further elucidated by the devise to Joseph. He is not to have an equal or undivided third of the whole, but 'one-third of the place, with the stone coal quarry on it:' or in other words, one-third of the place to be taken off the eastern end of my place. And what is George to get? An equal undivided third of the whole? No. Any interest in the coal mines already opened? No. Any title to the mansion house? No. But 'all the remaining part of my real and personal estate after payment of debts and legacies.'

"Where then is the tenancy in common, so much talked of? The words used by chief justice Tilghman, in Frederic *v.* Gray, 11 *Serg. & Rawle* 187, do most fully apply to this case:—'Now in the first place there was an error in saying, that the devisees were tenants-in-common. The devise was to each in severalty of a moiety' (here a third) 'to be laid off at a particular end of the tract. *Certum est quod certum reddi potest.* Either of the devisees might have supported an ejectment for his moiety without partition, and the jury might have laid it off for him. Tenants-in-common have unity of possession of the whole, which certainly these devisees had not; and on a writ of partition between tenants-in-common, the land is divided not according to quantity, but value. One may have greater quantity, but no more than equal value. But the partition between these devisees was according to quantity, and each was to have his quantity in a certain place.'

"Now wherein does that case differ from this? In that the division was in two parts. Here into thirds. The relative position of two of the portions fixed; though not defined with mathematical accuracy; yet so that any sensible man on the land, could be at no

[Fleming v. Kerr.]

loss how to set off the portion intended for each.   It is plain, there-
fore, that the words ' third part' as here, used like ' moiety' there, is
descriptive of quantity only.   There is no one expression in the
will, showing that there should be owelty of partition; or that the
testator intended to make his children all equal, or (as has been
most strenously argued) that the plaintiff was the peculiar object of
testator's bounty.   The case has been argued, as if the testator in
prophetic vision, had in his mind's eye, all the changes that have
taken place for near fifty years after the making of his will; and
thirty after his death.   On the contrary his will shows, that equality
was not the intention of the testator.   Susannah's share is encum-
bered with the life estate of her mother.   Margaret gets only 15
pounds.   George gets the residue of the estate after paying debts
and legacies.

"But it is complained now, that this residue given to George thus
encumbered, is better land than Joseph's, (a fact somewhat doubt-
ful,) who had to pay nothing.   That Susannah got better land than
Joseph who was encumbered with no life estate.   What sort of
owelty or equality would it bring about now, to divide according
to quantity and quality, for the sake of coming at this fancied in-
tention of the testator?   Suppose the partition had been made in
1807, what a strange exhibition of owelty, equality and equity, so
much talked of, to give as plaintiffs have claimed: Joseph 106 acres,
clear of incumbrances; Susannah 80 acres, in expectancy, and
George 53 acres, encumbered with the debts and legacies of the
deceased.

"But the parties themselves have put a construction on this will;
and which shows their good sense; and have submitted to it for
thirty years; and I see no reason now why it should be altered to
suit the notions entertained by some of their neighbors.

" The witnesses all agree that ever since their father's death,
they have each held in severalty that portion so plainly intended
for each by this will; that they never have in fact held in common;
although living together under the same roof.   It is true, their
boundary lines were not actually ascertained or defined.   But it
does not follow, that adjoiners who have an uncertain boundary,
are tenants-in-common.   The parties seem never to have dreamed
that they were tenants-in-common, from the death of their father to
this day; and not until after their arrival at second childhood, have
their committee made the discovery, that these old people have
been cheating one another all their lives, and did not know it.

" If the court, therefore, are correct in their construction of this
will, the claim of the plaintiff to recover an undivided third part of
these premises, or to reduce the defendant to 53 acres, instead of
80, is not founded in law.   As to the little mistake of an acre; if
there really be that much of a mistake—the court think, that under
the circumstances already mentioned, if believed by the jury, the
line should not be altered to remedy that mistake.   It would en-

[Fleming v. Kerr.]

courage litigations about boundaries too much, if all the hair-breadth mistakes could be rectified by a law suit at any time, after a boundary line has been adopted and been acquiesced in; especially if this release or confirmation was given by plaintiff while in the use of her faculties, and without any fraud practised on her, and I know of no testimony showing there was any; and much more so, if you believe the line was run with the consent of all parties at the time, and plaintiff purchased on the faith of it."

The plaintiff in error assigned the following errors in the charge of the court below:—

1. The court erred in stating to the jury as a fact, that Joseph and Susannah saw and knew the line of division as run by Van-kirk, and acquiesced in it for fifteen years, and the said line was binding upon them.

2. The court erred in saying, " that unless some greater mistake had been made, than the one acre and 57 perches in the measurement, or some greater fraud committed on the rights of the plaintiff, the court and jury ought not, under the circumstances of the case, to disturb the line as it has been established."

3. The court erred in deciding that the estate devised, was not a tenancy in common.

4. The court erred in taking from the jury, the right of determining what was the intention of the testator, although in assuming the construction, the court was not guided by the words of the will, but by facts and circumstances *aliunde.*

*Baird,* for plaintiff in error.
*Metcalf* and *Forward,* for defendant in error.

ROGERS, J., expressed the opinion of the court, as corresponding in all points with that of the court below.

Judgment affirmed.

## Elliott *against* Powell.

A *tort feasor* cannot have a civil suit against the owner of the freehold, in any form, whether *trespass vi et armis,* trover, or replevin.

Title to real estate may be tried incidentally in a transitory action: *Hence,* a defendant in replevin for a crop of grain cut and carried away by him, may show that the *locus in quo* was his freehold, and that by his entry, the plaintiff's possession was divested, and he himself reinstated.

By the entry of the owner, claiming right, and the severance of the grain, it becomes his chattel, for which replevin will not lie by the former occupant. The only remedy is ejectment, and an action for the mesne profits. *Aliter,* if the grain had been sowed by the plaintiff, who was in the actual possession at the time of such severance.

x.—2 o